UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MICHELLE L. JERKINS,

      Plaintiff,

vs.                            Case No.  3:06-cv-490-J-MCR

MICHAEL J. ASTRUE[1], Commissioner of the
Social Security Administration,

      Defendant.

_____/

**MEMORANDUM OPINION AND ORDER[2]**

This cause is before the Court on Plaintiff's appeal of an administrative decision denying her application for Social Security benefits.  The Court has reviewed the record, the briefs, and the applicable law.  For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.

**I.     PROCEDURAL HISTORY**

Plaintiff protectively filed an application for Disability Insurance Benefits ("DIB") on May 25, 2003,[3] alleging an inability to work since December 15, 2000.  (Tr. 63-65).  The Social Security Administration ("SSA") denied the application initially and upon

---

[1] Michael J. Astrue became the Commissioner of Social Security Administration on February 1, 2007.  In accordance with Fed. R. Civ. P. 25(d)(1), Michael J. Astrue should be substituted as Defendant in this litigation.

[2] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge.  (Doc. 20).

[3] This is the date on which Plaintiff signed her application for DIB.  (Tr. 65).  However, the application was initially filed protectively on February 10, 2003.  (Tr. 125).

reconsideration.  (Tr. 30-34, 37-38A).  Plaintiff then requested and received a hearing

before an Administrative Law Judge (the "ALJ") on July 7, 2005.  (Tr. 41-42, 57).  On August

17, 2005, the ALJ issued a decision finding Plaintiff not disabled.  (Tr. 16-28).  Plaintiff filed

a Request for Review by the Appeals Council on September 16, 2005 (Tr. 15), but the

Appeals Council denied the request on March 30, 2006 (Tr. 7-9).  Accordingly, the ALJ's

August 17, 2005 decision is the final decision of the Commissioner.  Plaintiff timely filed her

Complaint in the United States District Court on May 30, 2006.  (Doc. 1).

## II.    NATURE OF DISABILITY CLAIM

### A.    <u>Basis of Claimed Disability</u>

Plaintiff claims to be disabled since December 15, 2000 (Tr. 63) due to multi-level

cervical discectomy (Tr. 129), anterior cervical fusion, cervical nerve root compression and

irritation (Tr. 34, 109), and joint pain (Tr. 38A).

### B.    <u>Summary of Evidence Before the ALJ</u>

On the date the ALJ's decision was issued, Plaintiff was thirty-seven years of age (Tr.

466) with a high school education (Tr. 115, 137) and some college (Tr. 361, 466).  Plaintiff

has past relevant work experience as a debit insurance sales representative, a food service

manager (Tr. 110, 130), a bartender, and a convenience store manager (Tr. 144).

#### 1.    <u>Plaintiff's Impairments</u>[4]

On December 15, 2000, Plaintiff suffered an injury as a result of an attempted car

jacking.  (Tr. 469).  As a result of the incident, the two ruptured discs in her neck were

aggravated (Tr. 470) and she experienced pain in her neck, back, and right arm which

---

[4] Plaintiff does not allege any mental impairments; therefore, the Court discusses only
her physical impairments.

continued after the incident (Tr. 206, 470).  Even before the incident, however, Plaintiff had neck and bilateral arm pain for several years and had been treated by Dr. Hoffman.  (Tr. 303).  Prior to December 15, 2000, Plaintiff was diagnosed with cervical thoracic syndrome due to degenerative disc disease and prescribed a TENS unit.  Id.

After the car jacking incident, on December 18, 2000, Plaintiff was admitted to Memorial Hospital Jacksonville for neck and back pain.  (Tr. 199).  The X-rays of the cervical spine revealed "nonspecific loss of the cervical lordosis but with no acute fracture or degenerative change."  (Tr. 205-06).  She was diagnosed with neck sprain and was prescribed medication.  (Tr. 190-91).  The same month, Plaintiff also reported to Baptist/St. Vincent's Occupational Health and was diagnosed with neck strain.  (Tr. 215).  She was advised not to drive except to and from work, not to lift, push, or pull more than five pounds, not to do overhead work, and not to use her right arm.  Id.  During her second visit to Baptist/St. Vincent's her physical exam revealed tenderness, joint pain, and pain with adduction and external rotation.  (Tr. 214-16).  Dr. David M. Johnson's impression was shoulder strain and a history of disc disease of the neck.  Id.  She was advised not to drive except to and from work, not to lift, push, or pull more than ten pounds, and to use her right arm on a limited basis.  Id.  She was prescribed medications and placed in a shoulder immobilizer.  Id.

On January 9, 2001, Plaintiff reported to Baptist/St. Vincent's for a re-check with complaints of pain and stomach discomfort caused by the medication.  (Tr. 212-13).  She was again advised not to drive except to and from work and to use her right arm only on a limited basis.  (Tr. 212).  In January, Plaintiff also visited Dr. M. John Von Thron with right upper extremity pain, a burning sensation in her arm, and numbness and tingling in her

3

hand.  (Tr. 248).  Dr. Thron stated that "[a]ny attempts at active or passive range of motion seem to bother her right upper extremity."  Id.  His impression was right shoulder strain, right upper extremity neuropathy, and possible rotator cuff strain.  (Tr. 247).  Dr. Thron concluded Plaintiff "should not return to her usual duties at work because that involves driving all of the time."  Id.

In February 2001, Plaintiff underwent a right shoulder MRI and the results were normal.  (Tr. 217).  She reported to Dr. Thron who stated Plaintiff's right arm was tender, her shoulder, arm, and hand were swollen, and her hand had some color change.  (Tr. 246).  Dr. Thron's impression was Reflex Sympathetic Dystrophy ("RSD")[5] of the right upper extremity and possible cervical spine radiculopathy.  Id.  He restricted her use of the right arm.  (Tr. 244).  Plaintiff was also examined by Dr. Gerardo Florez and Dr. David Scales who noted she had difficulty moving her right upper extremity as well as severe pain and trigger points in her muscles.  (Tr. 221-22).  Plaintiff was diagnosed with severe chronic myofascial pain syndrome in the right upper back, shoulder, and upper extremity, and with headaches of cervical origin.  (Tr. 223).

On March 14, 2001, Plaintiff visited Dr. Thron with shoulder and arm complaints.  (Tr. 245).  Dr. Thron noticed changes in her skin color and sweating of her entire arm.  Id.  His impression was RSD, Id., and he noted Plaintiff was under a temporary total disability (Tr. 242).  On March 15, 2001, Plaintiff underwent an upper nerve conduction study and electromyography.  (Tr. 218).  Dr. David F. Scales noted the results were normal except for

---

[5] The terms RSD (also called Reflex Sympathetic Dystrophy Syndrome ("RSDS")) and Complex Regional Pain Syndrome ("CRPS") are synonymous, SSR 03-02p, and are used interchangeably by the Court.

the "relatively severe myofascial hyperirritability at the right rhomboid with trigger points and at the right brachioradialis with trigger points."  Id.  On March 16, 2001, Plaintiff visited Plaza Surgery Center Pain Clinic with complaints of pain in her right shoulder and arm.  (Tr. 232-33).  The physical exam revealed right hand allodynia and a purplish discoloration as compared to the left hand, and diminished motor strength due to the severity of the pain. (Tr. 233).  She was diagnosed with RSD of the right arm and was treated with a Stellate Ganglion Block ("SGB") procedure.  (Tr. 232-33).  On March 22, 2001, Dr. Claudio E. Vincenty stated Plaintiff's nerve conduction studies were generally normal.  (Tr. 229).  On March 27, 2001, Plaintiff underwent a right SGB for her RSD and was discharged in good condition.  (Tr. 224).

On March 30, 2001, Plaintiff visited Dr. Thron for reevaluation.  (Tr. 241, 243).  The physical exam showed discomfort, swelling, skin discoloration, and limited use of the right upper extremity.  (Tr. 243).  Dr. Thron's impression was radiating pain in the right upper extremity possibly resulting from a nerve root injury and "a lot of signs and symptoms of RSD although the stellate ganglion block did not seem to confirm the diagnosis."  (Tr. 241). He noted Plaintiff did "not have any symptoms related to her shoulder" and the "problem [seemed] to be more nerve related."  Id.  He stated Plaintiff might have RSD or nerve root avulsion, or herniated disc, or a combination of all of these.  Id.  He advised her to work on her range of motion and to see a neurologist.  Id.  Dr. Thron concluded Plaintiff was "unable to work due to her significant discomfort," she could not use her right arm, but she could potentially use her left arm.  Id.  On April 4, 2001, Dr. Thron again opined that Plaintiff was currently "unable to work due to the severe pain."  (Tr. 238).

On April 24, 2001, Plaintiff reported to Dr. Bruce A. Hartwig for a neurological exam.

5

(Tr. 260).  The exam showed full strength in her upper extremities, normal sensation, symmetric reflexes, no discoloration, and no temperature difference.  Id.  Dr. Hartwig concluded there was no clinical evidence of RSD.  (Tr. 261).  On May 15, 2001, Plaintiff was examined by Dr. Hawkins.  (Tr. 252).  The physical exam demonstrated ability to extend the neck 15 degrees, ability to look right and left 45 degrees, full range of motion and coordination of both upper extremities, and twenty percent loss of pin in the right C5 and left C6 (Tr. 253).  Dr. Hawkins's impression was questionable disc herniation, neck pain, and headaches.  (Tr. 254).

On May 16, 2001, Plaintiff's cervical spine MRI revealed left paracentral and right posterolateral intervertebral disc protrusion.  (Tr. 346).  Dr. Hawkins's impression was right 6-7 cervical disc.  (Tr. 250-51).  He opined that Plaintiff's many complaints would not be resolved by any surgery.  (Tr. 250).  On June 6, 2001, Plaintiff was again examined by Dr. Hartwig who noted Plaintiff had full strength, normal sensation, and symmetric reflexes.  (Tr. 258-59).  He informed Plaintiff she could return to work.  Id.  On September 25, 2001, Plaintiff's MRI was also reviewed by Dr. Jacob Green who stated the MRI showed a significant ruptured disc.  (Tr. 323).  He noted the slightly decreased temperature in the right hand could be indicative of RSD.  (Tr. 324-25).  Dr. Green stated Plaintiff was unable to return to work until October 25, 2001.  (Tr. 454).

Plaintiff's complaints continued through 2002.  (Tr. 299, 305).  On April 10, 2002, she was examined by Dr. Calvin Hudson who observed the motion of her neck in all directions was moderately limited and she had some hypersensitivity in the right hand.  (Tr. 305).  He stated the myelogram and CAT scan confirmed the existence of a fairly large ruptured disc and advised Plaintiff to proceed with a cervical discectomy and fusion.  Id.  On the following

6

day, Plaintiff visited Dr. Green who diagnosed her with cervical disc and likely RSD.  (Tr. 321-22).  Dr. Green stated Plaintiff was unable to return to work full-time until May 10, 2002.  (Tr. 453).  On April 22, 2002, Dr. Hudson reviewed Plaintiff's MRI from May 2000 and April 2001 and stated the car jacking incident on December 15, 2000 only worsened her preexisting neck and arm pain because she already had a small ruptured disc in the neck.  (Tr. 303).

On May 9, 2002, Plaintiff reported to Dr. Green who diagnosed her with cervical disc and RSD.  (Tr. 320).  He noted Plaintiff could not return to work until May 27, 2002 (Tr. 452).  On May 24, 2002, Dr. Green observed loss of normal range of motion and stiffness in the neck.  (Tr. 319).  He diagnosed Plaintiff with cervical disc with radiculopathy.  Id.  Plaintiff's June 13, 2002 infrared imaging study was abnormal.  (Tr. 318).  On June 14, 2002, Dr. Green diagnosed her with cervical disc, radiculopathy, and possible autonomic pain syndrome.  (Tr. 317).  He stated Plaintiff was not able to work until June 28, 2002.  (Tr. 317, 451).

On June 25, 2002, Dr. Hudson stated Plaintiff had moderate limitations of the motion of her neck and should not turn her neck, lift, or return to work at that time.  (Tr. 300).  He opined Plaintiff would have permanent physical restrictions mainly relating to her neck and head movement.  (Tr. 301).  He added:

> I doubt that she should ever do a job requiring her to turn her head to the extremes more than 10 times an hour.  Nor a job requiring her to do a lot of book work looking down constantly or any kind of job requiring her to look up constantly or to the side.

Id.  Three days later, Dr. Green observed decreased temperature in Plaintiff's right extremity, compared to the left, that was confirmed by infrared thermogram.  (Tr. 316).  Dr.

7

Green diagnosed Plaintiff with cervical disc and RSD (Id.), and stated she was unable to return to work full-time until July 30, 2002 (Tr. 450).  On July 17, 2002, he stated the lab studies indicated likely RSD and diagnosed Plaintiff with RSD and multi-level cervical disc. (Tr. 315).

On July 22, 2002, Plaintiff underwent an EKG which revealed normal sinus rhythm and normal ECG.  (Tr. 274).  On July 26, 2002, Dr. Hudson stated Plaintiff had "marked limitation of motion of her neck."  (Tr. 307).  Three days later, Dr. Green diagnosed her with cervical discs and RSD.  (Tr. 313).  On July 31, 2002, Plaintiff was admitted to St. Vincent's Medical Center.  (Tr. 269).  The studies revealed "a fairly large ruptured disk" and some hypersensitivity in her right hand.  Id.  The physical exam showed some tenderness and moderate limitation of motion of the neck in all directions.  (Tr. 272).  Plaintiff was diagnosed was herniated nucleus pulposus C5-6 and C6-7.  (Tr. 269).  Dr. Calvin H. Hudson performed an anterior cervical fusion with discectomy and plating C5-6 and C6-7.  (Tr. 269-70). Plaintiff did well after the surgery and was discharged on August 1, 2002.  (Tr. 269).  On August 27, 2002, Plaintiff reported her arm and neck pain was better and her numbness was gone.  (Tr. 307).  Dr. Hudson noted her X-rays looked good, but she was unable to return to work at that time.  Id.

On October 8, 2002, Dr. Hudson noted Plaintiff's neck, arm, and tingling were better and the motion of her neck in all directions was moderately limited.  (Tr. 299).  He advised Plaintiff to permanently avoid turning her head to the extremes more than ten times an hour and lifting over thirty pounds.  (Tr. 298-99).  On January 10, 2003, Dr. Hudson indicated Plaintiff was "fairly comfortable at a relatively inactive state."  (Tr. 298).  He advised her to gradually increase the mobility of her neck.  Id.  On January 14, 2003, Dr. Hudson stated

8

Plaintiff had "reached maximum medical improvement," she had a twelve percent physical impairment rating on her body as a whole, she should not turn her head to the extremes more than ten times an hour permanently, and she should not lift more than thirty pounds permanently.  (Tr. 86, 298).  He opined she could return to work within these limitations.  Id. On February 6, 2003, Dr. Hudson stated Plaintiff had moderate limitation of motion of her neck, but she was able to turn her head fairly well.  (Tr. 297).

On May 13, 2003, Dr. Hudson opined Plaintiff's partial disability was continuous and she should permanently avoid turning her head to the extremes more than ten times an hour and lifting more than thirty pounds.  (Tr. 296).  His diagnosis was ruptured disc, cervical fusion with discectomy, and plating.  Id.  On May 20, 2003, Dr. Green noted Plaintiff's reflexes were hypoactive and diagnosed her with radiculopathy, cervical RSD, and post-operative disc.  (Tr. 449).  On July 23, 2003, Plaintiff complained of continuous neck and arm pain when she visited Southside Medical Center, but stated she did not take her pain medication on a regular basis.  (Tr. 345).

On September 3, 2003, a State Agency consultant completed a physical RFC assessment of Plaintiff (Tr. 326-33) which stated Plaintiff was able to lift and/or carry twenty pounds occasionally and ten pounds frequently, and stand, walk, and/or sit for six hours in an eight-hour workday (Tr. 327).  No postural (Tr. 328), manipulative, visual (Tr. 329), communicative (Tr. 330), or push/pull limitations were assessed (Tr. 327).  The State Agency consultant also noted Plaintiff should avoid concentrated exposure to vibration and hazards due to her cervical fusion.  (Tr. 330).

On December 23, 2003, another State Agency consultant, Dr. Eric C. Puestow, completed a second physical RFC assessment of Plaintiff.  (Tr. 334-41).  He stated Plaintiff

was able to lift and/or carry twenty pounds occasionally and ten pounds frequently, and stand, walk, and/or sit for six hours in an eight-hour workday.  (Tr. 335).  No visual (Tr. 337) or push/pull limitations were assessed (Tr. 335).  Dr. Puestow noted Plaintiff was able to crawl occasionally and climb, balance, stoop, kneel, and crouch frequently (Tr. 336), she was limited in her ability to reach in all directions (Tr. 337), and she should avoid concentrated exposure to hazards (Tr. 338).  Dr. Puestow concluded Plaintiff's symptoms were attributable to medically-determinable impairment(s), but that their severity or duration were disproportionate to the expected severity or duration of such medically-determinable impairment(s).  (Tr. 339).

On February 18, 2004, Dr. Harold Laski diagnosed Plaintiff with chronic neck pain and RSD.  (Tr. 342).  He stated Plaintiff was "able to function fairly well while taking the medication," was "able to sit or stand for short lengths of time," was "unable to drive a car due to her inability to turn her head to either side more than 4-5 times an hour."  (Tr. 343).  Dr. Laski advised Plaintiff to avoid turning her head to the extremes.  (Tr. 344).  On May 18, 2004, Dr. Green diagnosed Plaintiff with history of RSD, failed neck, and continual radiculopathy.  (Tr. 444).  Plaintiff's May 25, 2004 CT scan of the cervical spine revealed fusion changes at C5-6 and C6-7 levels.  (Tr. 440-41).  On June 1, 2004, her lab/X-ray results revealed cervical fusion and Dr. Green diagnosed her with RSD, cervical fusion, and radiculopathy.  (Tr. 435).  On June 7, 2004, Dr. Green noticed Plaintiff's right hand was cooler and sweatier than the left and diagnosed her with RSD and cervical fusion.  (Tr. 429).  On June 14, 2004, Plaintiff's neurologic examination was normal.  (Tr. 424).  Dr. Green diagnosed her with chronic intractable pain, RSD, and neck fusion.  Id.

On June 22, 2004, Plaintiff reported to the Institute of Pain Management with pain in

the neck, right shoulder, and arm.  (Tr. 347).  She rated her overall health as excellent.  (Tr. 353-54).  The physicians' impression was status post anterior cervical interbody fusion C5-6 and C6-7, with residual neck pain and right upper extremity radicular pain, complex regional pain syndrome, and myofascial pain syndrome.  (Tr. 355).  The following day, Plaintiff saw Dr. Green who observed Plaintiff's vasomotor tone was excellent.  (Tr. 419).  His diagnosis was RSD.  Id.  On July 6, 2004, Dr. Orlando G. Florete, Jr., examined Plaintiff and noted tenderness to palpation, decreased range of motion of the cervical spine, and discogenic and facet disease with radiculopathy.  (Tr. 349).  On July 13, 2004, Plaintiff was examined by Dr. Green who noted her reflexes were hypoactive, she had multiple problems in the spinal area, and diagnosed her with RSD, post-operative failure.  (Tr. 414-16).

On August 5, 2004, Plaintiff's nerve conduction study was abnormal.  (Tr. 412).  On August 13, 2004, Dr. Green's primary diagnosis was RSD.  (Tr. 408).  On September 13, 2004, Plaintiff told Dr. Green the medications really helped her.  (Tr. 401).  The neurological examination indicated her reflexes were virtually absent.  Id.  Her nerve conduction study was abnormal and Dr. Green diagnosed her with sympathetic pain.  Id.  He stated Plaintiff's warmer hands  were "an excellent sign of recovery at some point in time which is unusual at this point late into the disorder."  (Tr. 401-02).

On January 11, 2005, Dr. Green diagnosed Plaintiff with cervical disc and radiculopathy.  (Tr. 382).  On February 11, 2005 and on March 11, 2005, he diagnosed her with cervical disc and RSD.  (Tr. 373, 376).  On April 8, 2005, Plaintiff reported to Dr. Green with numbness in her arm (Tr. 368) and level eight pain in the neck, right arm, and shoulder. (Tr. 372).  The neurological examination showed increased vasomotor tone and more pinkish color in her right hand.  (Tr. 368).  Dr. Green diagnosed Plaintiff with RSD, cervical

disc, and radiculopathy.  Id.  He noted Plaintiff should quit smoking because it caused vasomotor spasm and affected her RSD.  Id.  On June 3, 2005, Plaintiff visited Dr. Green who noted her right arm was more swollen than the left and her reflexes were not active at all.  (Tr. 455).  Dr. Green diagnosed her with likely RSD and radiculopathy.  Id.

On February 18, 2005, Mark Capps, a Vocational Rehabilitation Counselor, completed a Comprehensive Vocational Evaluation of Plaintiff.  (Tr. 166-71).  He stated Plaintiff was "not limited to any specific area of work category based on aptitudes."  (Tr. 168).  Plaintiff reported she could consider any type of work that she could perform from home.  (Tr. 170).  Mr. Capps concluded that Plaintiff was not ready for direct job placement, but based his conclusion on Plaintiff's own statements that "she [was] not capable of working on a competitive basis on a full-time or part-time basis."  Id.  Similarly, Mr. Capps' opinion on Plaintiff's ability to tolerate a full day of work was based on Plaintiff's own statements.  Id.

On June 16, 2005, a State Agency consultant completed a Functional Capacity Evaluation ("FCE") of Plaintiff, and found the maximum capability level at which Plaintiff could function was sedentary (exerting up to ten pounds of force occasionally).  (Tr. 457-59).  The FCE stated:

> [Plaintiff] demonstrated apprehension during material handling, with utilization of compensatory lifting techniques, to minimize use of her right upper extremity, and was unable to perform overhead activities, due to her pain.  Testing revealed some functional capabilities consistent with the sedentary duty work level, but may have difficulty participating on a consistent or full time basis, due to her poor tolerance to sustained sedentary activities, such as prolonged sitting, standing, walking, and indicated 2-3 hours of intermittent use of lying down throughout her day for management of her pain symptoms.

Id.  The consultant concluded that Plaintiff could bend, squat, kneel, and reach with her right

arm occasionally, reach with her left arm frequently, but should avoid crawling, twisting, stooping, and climbing ladders.  (Tr. 458).  He indicated Plaintiff was able to sit for up to an hour at a time and for a total of two to four hours a day, she was able to stand and walk for up to an hour at a time and for a total of one to two hours a day, but she should avoid driving.  Id.  He also indicated Plaintiff was able to perform gross and fine movements with both hands and both feet.  Id.  Finally, he stated Plaintiff was able to lift fifty-one pounds with her left hand and fifty pounds with her right hand, able to complete only two of the five handgrip tests due to the pain, and had moderate to significant range of motion restrictions. (Tr. 459).

### 2. Summary of Plaintiff's Testimony

During the ALJ's hearing on July 7, 2005, Plaintiff testified she was unable to work because she was unable to find a position that she could pursue from her house that would allow her to take frequent breaks to alleviate the pain.  (Tr. 468).  She testified her medications helped with the pain, but made her tired and upset her stomach.  (Tr. 468-69). She stated she had a slight improvement in the neck pain since the surgery in July 2002, but her arms have swelled.  (Tr. 471).  She also testified she had pain in both sides of her neck, in her back, right shoulder, underneath the shoulder blade, around the edges, down her right arm into her hand, across the top of her left shoulder, and down the upper part of her left arm.  (Tr. 477).  Additionally, she testified she could sit for an hour, stand for an hour, and walk for half an hour and that walking aggravated the pain in her upper body.  (Tr. 478-80).  She stated she had trouble holding objects with her hands and she had tremors when trying to hold or use the object.  (Tr. 479).  In fact, she testified she could lift only about a pound, but not repeatedly.  Id.

13

Plaintiff testified she did very little housework, did one load of laundry every other day, cooked every day, but did not wash dishes, make the bed, vacuum, sweep, mop, take the trash out, or work in the garden.  (Tr. 472-73).  She reported that she read four or five hours a day – which amounted to ten books a week on average – watched television for two to three hours a day, listened to radio or music occasionally, did research on the Internet for two hours a day, went to the grocery store once a week, drove once a week, and was able to dress and take a shower.  (Tr. 473-77).

### C.   Summary of the ALJ's Decision

A plaintiff is entitled to disability benefits when she is unable to engage in a substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a). The ALJ must follow five steps in evaluating a claim of disability.  20 C.F.R. § 404.1520(a). First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).

Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(f).  Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.  20 C.F.R. § 404.1520(g).

Plaintiff bears the burden of persuasion through step four, while at step five, the burden

shifts to the Commissioner.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

In the instant case, the ALJ determined Plaintiff met the non-disability requirements

for a period of disability and DIB as set forth in Section 216(i) of the Social Security Act

through the date of his decision.  (Tr. 20, 27).  At step one, the ALJ found Plaintiff had not

engaged in a substantial gainful activity since her alleged onset date, December 15, 2000.

Id.  At step two, the ALJ held Plaintiff had RSD and a history of cervical spine surgery (Tr.

20), impairments that considered "severe" under 20 C.F.R. § 404.1520(c) (Tr. 27).  At step

three, the ALJ found Plaintiff's impairments were "not 'severe' enough to meet or medically

equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart

P, Regulations No. 4."  (Tr. 21).  The ALJ determined Plaintiff retained the RFC:

> to lift 5 pounds at any time.  She does not have any sitting limitations except that
> she should have a sit/stand option using 1-hour cycles in an 8-hour workday.
> She can walk for 30 minutes continuously.   She should avoid ladders,
> unprotected heights and the operation of heavy machinery.  She should also
> avoid jobs that have unusual stress.  She can occasionally bend, crouch or kneel;
> she should not crawl, twist or stoop.  She should avoid overhead and repetitive
> reaching as well as grasping.

(Tr. 21-22).

At step four, based on the testimony of the vocational expert ("VE"), the ALJ found

Plaintiff was "unable to perform her past relevant work."  (Tr. 26).  At step five, based on the

testimony of the VE, the ALJ concluded Plaintiff had "capacity for work that exists in

significant numbers in the national economy and is not under a 'disability' as defined in the

Social Security Act, at any time through the date of this decision" based on her age,

education, work experience, and RFC.  Id.  The sedentary work positions listed in the ALJ's

opinion include an information clerk, an appointment clerk, and a call out operator.  (Tr. 28).

15

III.    **ANALYSIS**

A.    <u>**The Standard of Review**</u>

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards,  <u>McRoberts v. Bowen</u>, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence,  <u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982) and <u>Richardson</u>, 402 U.S. at 401).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as a finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991); <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. <u>Foote</u>, 67 F.3d at 1560; <u>accord</u> <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837 (11th Cir. 1992) (explaining a court must scrutinize the entire record to determine the reasonableness of the factual findings).

B.    <u>**Issues on Appeal**</u>

Plaintiff argues three issues on appeal.  (Doc. 25).  First, she asserts the ALJ did not

16

substantially evaluate her RSD because he failed to follow the provisions of Social Security

Ruling ("SSR") 03-02p.[6]  (Doc. 25, pp.6-11).  The Commissioner responds the ALJ properly

evaluated Plaintiff's RSD and he adequately followed the provisions of SSR 03-02p.  (Doc.

26, p.4).  Second, Plaintiff argues the ALJ did not adequately evaluate the effects of her

severe impairments and as a result, overestimated her RFC.  (Doc. 25, p.12).  The

Commissioner responds the ALJ properly assessed Plaintiff's RFC and cited specific

evidence on which he based his decision.  (Doc. 26, p.5).  The Commissioner asserts the

ALJ's failure to address some items of evidence amounts only to a harmless error.  (Doc.

26, pp.5-7).

Finally, Plaintiff contends the ALJ's credibility findings were not supported by the

substantial evidence of record.  (Doc. 25, pp.14-18).  The Commissioner responds the ALJ

properly evaluated the credibility of Plaintiff's subjective complaints and properly determined

her pain would not prevent her from performing sedentary work.  (Doc. 26, pp.8-10).  The

Court has reviewed the record, the briefs, and the applicable law, and finds the ALJ properly

evaluated Plaintiff's RSD, RFC, and credibility.  In an effort to avoid repetition, however, the

Court will first discuss the ALJ's evaluation of Plaintiff's credibility, then his assessment of

Plaintiff's RFC, and finally, his evaluation of Plaintiff's RSD.

### 1. Whether the ALJ properly evaluated the credibility of Plaintiff's subjective complaints.

Plaintiff argues the ALJ's credibility findings were not supported by the substantial

evidence of record.  (Doc. 25, pp.14-18).  The Court has reviewed the record and finds the

---

[6] SSR 03-02p is also cited as 68 FR 59971.

ALJ did not err when he evaluated the credibility of Plaintiff's subjective complaints.

The ALJ must consider all of a claimant's statements about her symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

Foote, 67 F.3d at 1560 (quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)).  Even if "the ALJ does not cite or refer to the language of the three-part test," the pain standard is properly addressed when the ALJ's "findings and discussions indicate that the standard was applied."  Wilson v. Barnhart, 284 F.3d 1219, 1225-26 (11th Cir. 2002).

A claimant may establish her pain is disabling through objective medical evidence that an underlying medical condition exists that could reasonably be expected to produce the pain.  Foote, 67 F.3d at 1561.  "Once a claimant establishes through objective medical evidence that an underlying medical condition exists that could reasonably be expected to produce pain, sections 404.1529 and 416.929 provide that the Commissioner must consider evidence about the intensity, persistence, and functionally limiting effects of pain in deciding the issue of disability."  French v. Massanari, 152 F. Supp. 2d 1329, 1336 (M.D. Fla. 2001).  When Plaintiff's "statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ "must

make a finding on the credibility of the individual's statements based on a consideration of the entire case record."  SSR 96-7P.

In the present case, the ALJ determined that Plaintiff had "the following severe impairments: a history of cervical spine surgery and reflex sympathetic dystrophy (RSD)." (Tr. 20).  Next, the ALJ considered Plaintiff's pain and other symptoms in determining her RFC.  (Tr. 21-26).  Because the ALJ determined that Plaintiff's subjective complaints were not fully supported by the objective medical evidence, the ALJ assigned "some weight" to Plaintiff's testimony to the extent it was supported by the objective medical findings.  (Tr. 24-25).  In doing so, the ALJ evaluated the credibility of Plaintiff's subjective complaints.  Id. The Court finds the ALJ's findings are supported by substantial evidence.

Because Plaintiff attacks five of the ALJ's reasons for finding Plaintiff's complaints questionable (Doc. 25, pp.14-17), the Court will discuss each of them in turn.  First, contrary to Plaintiff's argument (Doc. 25, p.14), the record does show that Plaintiff stated her surgery and medication helped her pain (Tr. 360).  Second, Plaintiff argues the ALJ improperly noted Plaintiff's "complaints concerning the ineffectiveness of prescribed medications were not relayed to Dr. Green."  (Doc. 25, p.14).  The Court finds Plaintiff misinterpreted the ALJ's words.  The record shows the ALJ actually stated that "[Plaintiff] told Dr. Green in September 2004 that she has done real well with the medications."  (Tr. 25).  This statement is supported by the record (Tr. 401) and therefore, the ALJ did not err in pointing out the inconsistency.

Third, contrary to Plaintiff's argument, the ALJ's statement based on Dr. Hudson's February 2003 report that Plaintiff "was able to turn her head fairly well," (Tr. 25) (internal quotations omitted), is supported by the record (Tr. 297).  Fourth, also contrary to Plaintiff's

19

argument, the ALJ's assertion that Plaintiff could "do some housework" (Tr. 25) is supported by the record (Tr. 353).  Fifth, the ALJ's statement that Plaintiff reported her health as excellent (Tr. 25) is clearly supported by the record (Tr. 353-54).  Moreover, the record demonstrates Plaintiff's statement was made as part of a review of all of her systems, including respiratory, cardiovascular, GI/GU, gynecology, immune, endocrine, musculoskeletal, neurologic, and psychological systems, Id., and it was not made only with respect to her respiratory and cardiovascular systems, as Plaintiff argues (Tr. 25, pp.15-16).

Finally, despite Plaintiff's argument otherwise, the ALJ's conclusion that Plaintiff was "still very active daily doing many work-related activities" (Tr. 25) is also supported by substantial evidence.  The record reveals that Plaintiff read books for four to five hours a day, did online research for two hours a day, cooked every day, and went to the grocery store once a week.  (Tr. 472-75).  In sum, the ALJ's reasons for giving only "some weight" to Plaintiff's statements are supported by substantial evidence.

## 2. Whether the ALJ properly assessed Plaintiff's RFC.

Plaintiff argues the ALJ did not adequately evaluate the effects of Plaintiff's severe impairments and as a result, overestimated Plaintiff's functional capacity.  (Doc. 25, p.12).  The Court has reviewed the record and finds the ALJ properly assessed Plaintiff's RFC.

The ALJ is required to consider all of the evidence in the claimant's record when making a disability determination.  20 C.F.R. § 404.1520(a)(3).  In addition, the ALJ must state the weight afforded to the evidence considered.  Ryan v. Heckler, 762 F.2d 939, 941 (11th Cir. 1985).  Specifically, the ALJ "should state the weight he accords to each item of impairment evidence and the reasons for his decision to accept or reject that evidence."  Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990).  Generally, the ALJ should give

20

more weight to a treating physician's opinion than to a consulting physician's opinion.  Wilson

v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984); Sabo v. Chater, 955 F. Supp. 1456, 1462

(M.D. Fla. 1996).  However, "the ALJ has the discretion to weigh objective medical evidence

and may choose to reject the opinion of a treating physician while accepting the opinion of a

consulting physician" when the ALJ can demonstrate "good cause" for his or her decision.

Gholston v. Barnhart, 347 F. Supp. 2d 1108, 1114 (M.D. Ala. 2003).  The ALJ may reject a

treating physician's opinion if it is contrary to the evidence, if it is a conclusory statement of

disability, or if it is not supported by the clinical or laboratory findings.  Wilson v. Heckler, 734

F.2d 513, 518 (11th Cir. 1984); see also Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir.

2004) (adding that good cause exists when the treating physician's opinion is inconsistent

with the physician's own records).

In the present case, the ALJ properly considered the treating physicians' and the

State Agency physicians' opinions, in addition to Plaintiff's testimony.  (Tr. 20-26).  The ALJ

properly gave "some weight" to Plaintiff's treating physicians' opinions to the extent they were

supported by medically-acceptable clinical and laboratory techniques and were consistent

with the other evidence in the record.  (Tr. 24).  In addition, the ALJ properly gave less

weight to the State Agency physicians' opinions, but did give them some weight to the extent

they were supported by the other evidence in the record.  Id.

The record indicates the ALJ's RFC (Tr. 21-22) was supported by the objective

medical evidence.  For instance, the ALJ's finding that Plaintiff could lift five pounds was

supported by the reports from Baptist/St. Vincent's which stated that Plaintiff was able to lift

five or ten pounds.  (Tr. 214-16).  The ALJ's finding on Plaintiff's ability to lift five pounds was

also consistent with the opinions of the State Agency consultants who stated Plaintiff was

able to lift and/or carry twenty pounds occasionally and ten pounds frequently (Tr. 327, 335) and with the Functional Capacity Evaluation which showed Plaintiff could lift fifty pounds (Tr. 459).  Moreover, the ALJ consistently gave Plaintiff's testimony the benefit of the doubt even when the objective medical evidence revealed Plaintiff's limitations were less severe than she claimed.  For instance, in determining that Plaintiff could walk for thirty minutes continuously (Tr. 23), the ALJ gave more weight to Plaintiff's own statement that she could walk for half an hour (Tr. 23, 479) than to the opinions of the State Agency consultants who opined that Plaintiff could walk for six hours in an eight-hour workday (Tr. 327, 335).

Further, contrary to Plaintiff's argument, the ALJ did not err in failing to consider the opinion of Mark Capps, Vocational Rehabilitation Counselor.  Mr. Capps's conclusions on Plaintiff's ability to tolerate a full day of work and on her readiness for direct job placement were based on Plaintiff's own statements and not on objective clinical or laboratory findings. (Tr. 170).  Therefore, the ALJ did not err by failing to consider his opinion.

In addition, despite Plaintiff's argument otherwise, the ALJ properly evaluated the June 16, 2005 Functional Capacity Evaluation even though he failed to expressly mention Plaintiff's "poor tolerance to sustained sedentary activities."  (Doc. 25, p.13).  The evaluation stated that Plaintiff "may have difficulty participating on a consistent or full time basis [in sedentary work]," but it also revealed Plaintiff had "some functional capabilities consistent with the sedentary duty work level."  (Tr. 457).  First, the ALJ did not err because he was free to reject the State Agency consultant's opinion to the extent it was not supported by the other evidence of record.  Here, the consultant's opinion was supported neither by the September 3, 2003 Physical RFC Assessment nor by the December 23, 2003 Physical RFC Assessment which revealed Plaintiff could sit for six hours in an eight-hour workday.  (Tr.

22

327, 335).  Second, the ALJ did not err because the Functional Capacity Evaluation stated Plaintiff had poor tolerance only to *sustained* sedentary activity (Tr. 457) and the ALJ's RFC was consistent with this limitation by noting that Plaintiff "should have a sit/stand option using 1-hour cycles in an 8-hour workday" (Tr. 21).

Finally, the ALJ did not err by failing to include in the VE's hypothetical question Dr. Hudson's opinion that Plaintiff should not turn her head to the extremes more than ten times per hour.  (Tr. 300-01).  When the hypothetical question does not include all of a claimant's limitations, the ALJ's decision which is significantly based on the expert testimony is not supported by substantial evidence.  Pendley v. Heckler, 767 F.2d 1561, 1562 (11th Cir. 1985).  In the present case, Dr. Hudson stated Plaintiff should not turn her head **to the extremes** more than ten times an hour permanently (Tr. 298) (emphasis added), but he also stated that she could return to work within these limitations, Id., that she was able to turn her head fairly well (Tr. 297), and that she had "reached maximum medical improvement" (Tr. 86, 298).  The Commissioner correctly points out that the limitation would not affect Plaintiff's ability to perform the sedentary jobs identified by the VE because they do not involve driving or excessive head movement.  (Doc. 26, p.6).  Thus, the Court finds the ALJ did not commit a reversible error because even if he had included the limitation in the hypothetical question, the outcome would not have been different.

### 3.  Whether the ALJ properly evaluated Plaintiff's RSD.

Finally, Plaintiff argues the ALJ did not substantially evaluate Plaintiff's RSD because he failed to follow the provisions of Social Security Ruling ("SSR") 03-02p.[7]  (Doc. 25, pp.6-11).  Under SSR 03-02p, the ALJ is required to use the sequential evaluation process and

---

[7] SSR 03-02p is also cited as 68 FR 59971.

evaluate the RSD as he would for any other medically-determinable impairment.  SSR 03-02p.

In the instant case, the ALJ properly evaluated Plaintiff's RSD.  The ALJ determined Plaintiff's RSD was a severe impairment, but "not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."  (Tr. 20-21).  Then, the ALJ properly proceeded to determine Plaintiff's RFC, Id., while also evaluating the intensity, persistence, and limiting effects of her symptoms (Tr. 21-26).  As discussed above, the ALJ properly determined Plaintiff's RFC and properly evaluated Plaintiff's credibility.

In discussing the limiting effects of Plaintiff's symptoms, the ALJ considered both Plaintiff's subjective complaints and the objective medical evidence.  For instance, the ALJ considered Plaintiff's testimony when he determined her ability to sit, walk, or grasp.  (Tr. 23).  The ALJ fully discussed the objective medical evidence (Tr. 19-28) and decided to give more weight to the opinions of Plaintiff's treating physicians than to the opinions of the State Agency physicians (Tr. 24).  The ALJ specifically acknowledged that Plaintiff was diagnosed with RSD and that her RSD symptoms posed additional limitations on her.  (Tr. 23).  Thus, Plaintiff's argument that the ALJ did not properly evaluate Plaintiff's RSD because he questioned it is without merit.  Although the ALJ pointed out the diagnosis was questionable, Id., such statement was supported by the record (Tr. 241, 261, 315, 322, 325); nevertheless, the ALJ found Plaintiff had RSD (Tr. 23).  In sum, the ALJ's evaluation of Plaintiff's RSD was proper.

## IV.    CONCLUSION

For the foregoing reasons, the Commissioner's decision is hereby **AFFIRMED**.  The

Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this _20th_ day of August, 2007.


_Monte C. Richardson_
MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE


Copies to:


Counsel of Record